FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2021 OCT 21 A 8: 53

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:21-cr-238 |
| | ) | |
| v. | ) | <u>Count 1</u>: 18 U.S.C. §§ 1343, 2 |
| | ) | (Wire Fraud) |
| TANNER JACKSON, | ) | |
| | ) | |
| *Defendant.* | ) | Forfeiture Notice |
| | ) | |

## **CRIMINAL INFORMATION**

### COUNT 1

Wire Fraud
(18 U.S.C. § 1343)

The United States Attorney charges that:

#### GENERAL ALLEGATIONS

At all times material to this Criminal Information, unless stated otherwise:

*Background on Body Armor and Helmets*

1. Departments and agencies of the United States Government routinely acquire personal protective equipment, such as helmets and body armor, to protect military and law enforcement personnel against ballistic threats in the line of duty.

2. Ballistic-resistant body armor protects against bullet penetrations and the blunt trauma associated with bullet impacts. These vests include soft body armor that protects against handgun bullets and less flexible tactical armor composed of soft and hard components that protect against handgun or rifle bullets. When purchasing body armor, military and law

enforcement agencies consider the kinds of threats their personnel will likely face and choose body armor with suitable properties to protect against those threats.

3. The National Institute of Justice ("NIJ")—the research, developmental and evaluation agency of the U.S. Department of Justice—promulgates certain minimum performance standards for various levels of protection provided by body armor. NIJ's police body armor performance standard for ballistic resistance is the only national standard for police body armor. Personal body armor covered by this NIJ standard is classified into five types (IIA, II, IIIA, III, IV) by level of ballistic performance. Type IIIA body armor is designed to withstand handgun bullets, but not rifle fire.

4. Among other requirements, the NIJ specifies that Type IIIA armor that is new and unworn shall be tested with specified .357 and .44 Magnum bullets of precise mass traveling at defined velocities, measured by scientific instruments. This requires a laboratory setting to achieve.

5. Departments and agencies of the United States Government typically specify which type or level of body armor protection they require, and demand testing in compliance with NIJ laboratory and testing standards.

6. The consequence of a failure of body armor is death or serious bodily injury.

7. Although NIJ's protection levels are specific to body armor, a third party purchaser or seller may specify the same protection levels for items such as police and military helmets. Thus, a helmet labeled as Type IIIA must be capable of withstanding specified handgun rounds without failure, that is, without excessive deformation or bullet penetration, similar to Type IIIA body armor, under specified laboratory testing conditions.

*Relevant Entities and Individuals*

8. The United States Department of State ("State Department") is a department or agency of the United States. The State Department's Office of Acquisition Management ("AQM") is located in Arlington, Virginia, in the Eastern District of Virginia. All United States Embassies are part of the State Department.

9. The System for Award Management ("SAM"), administered by the General Services Administration, was the primary database for the U.S. federal government to manage information on potential government contractors. Contractors were required to register in SAM in order to be eligible to receive a federal government contract. SAM's servers are located in Sterling, Virginia, within the Eastern District of Virginia.

10. FedBid, Inc. ("FedBid") was based in Vienna, Virginia, in the Eastern District of Virginia. FedBid was a full-service, reverse auction marketplace where government and commercial buyers posted purchase requirements and then sellers of those goods and services bid on those requirements. Many departments and agencies of the United States Government used FedBid to issue requests for quotation ("RFQ") for goods and services they wished to purchase. FedBid's computer servers were located in the Eastern District of Virginia. Thus, whenever a contractor submits a bid through FedBid, its bid comes through computer servicers in the Eastern District of Virginia. In or around February 2019, FedBid rebranded itself as "Unison Marketplace."

11. Defendant TANNER JACKSON is an individual who resides on a property in a rural area of Celeste, Texas.

12. Top Body Armor, LLC USA ("TBA"), based in Celeste, Texas, is a small reseller and manufacturer of various products—including body armor and helmets— sold to military and

3

law enforcement clients. Defendant TANNER JACKSON variously represented himself as a "Project Manager" or "Sales Manager" of TBA. TBA was owned by JACKSON's wife but operated by JACKSON out of the couple's homes, first from a single-family dwelling in Greenville, Texas, then from their home and garage on a parcel of land in a rural part of Celeste, Texas. Other than JACKSON and his wife, TBA had no other regular employees.

13. TBA was registered with SAM and used FedBid and SAM to conduct business with the government.

14. Bullet Proof Armor LLC was another small entity that JACKSON and his wife ran from their home and purported to manufacture certain items, such as police and military grade helmets.

15. Company A was a real freight and shipping company located in Texas. TBA used Company A to receive and ship products it sold to the government.

### THE SCHEME AND ITS OBJECT

16. From not later than June 2017 through approximately December 2020, in the Eastern District of Virginia and elsewhere, the defendant, TANNER JACKSON, devised, intended to devise, and executed and attempted to execute, a scheme and artifice to defraud a department or agency of the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by seeking and obtaining payment for body armor, helmets, and other products that were supplied to government clients based on material misrepresentations concerning the manufacturer, origin, supply chain, quality, testing, and delivery of products supplied by TBA.

## MANNER AND MEANS

17. To execute the above-described scheme, JACKSON would cause TBA to bid on solicitations for government contracts to supply body armor and helmets to police and military clients.

18. JACKSON would falsely represent on bids and in other communications with government contracting officers that TBA and Bullet Proof Armor were the manufacturers of body armor and helmets. In reality, JACKSON and TBA purchased those and other products from third parties, including a Chinese company, and were resellers of the helmets.

19. JACKSON would conceal and intentionally omit the fact that TBA was a reseller of Chinese-made products.

20. In bidding on contracts, and during the performance of the contracts, JACKSON would falsely claim that TBA's body armor and helmets to be supplied under the contracts were already tested as NIJ Type IIIA. In truth and in fact, at the time of bidding, TBA had had the the body armor and helmets laboratory-tested to NIJ standards, as the helmets had not yet been purchased from the Chinese company and JACKSON was in the process of acquiring the body armor components and assembling the body armor.

21. JACKSON would falsify or alter laboratory ballistics test results and forward the falsified or altered test results to government clients.

22. After his body armor failed actual laboratory testing, JACKSON created his own sham testing company, Texas Ballistics Laboratory LLC, to fabricate bogus ballistics test results to present to a government client in connection with the sale of body armor. The street address JACKSON provided on Texas Ballistics Laboratory's bogus test results did not exist. JACKSON also created a website for Texas Ballistics Laboratory, LLC, to make it appear legitimate.

23. JACKSON would use, without lawful authority or consent, the personal identifying information of real individuals, to pose, variously, as employees of one of his entities, as ballistics experts, or as employees of a real freight and shipping company, Company A, when those individuals never worked for such companies and did not consent to JACKSON using their personal identifying information.

24. JACKSON would create associated email accounts in the names of these persons— accounts which he actually controlled—and use them to communicate with himself and then to forward such communications to government officials in order to falsely reassure and lull government officials concerning the manufacturer, origin, quality, testing, and delivery status of body armor, helmets and other products supplied by TBA. For instance, JACKSON would fabricate email exchanges about fictitious truck accidents or COVID outbreaks at Company A, then forward the exchanges to government officials, in order to explain his delays in performing on contracts and to conceal the true cause of the delays, which was that he was actually purchasing items from China and waiting for their shipment to the United States, and clearance through United States Customs, before he could re-package and then ship them to the government as though they had originated from TBA.

25. JACKSON would falsely pose as a real United States Embassy official, as a senior foreign police official of the nation of Honduras, and others, to sign end-user agreements with his Chinese exporter in order to export the Chinese products to the United States. He did this so that he could then supply the products to the government, which, in turn, would provide them to foreign partners as part of an international assistance program.

26. After winning bids to supply helmets, body armor and other products to government clients, JACKSON would exchange emails with salespeople at a Chinese company

to purchase certain items such as the helmets, and JACKSON would purchase the items and have them shipped from China, then have Company A forward the products to government clients.

27. JACKSON would deliver some products late because TBA was not actually manufacturing those products nor had them on hand at the time JACKSON submitted TBA's bids to the government. Instead, JACKSON was sourcing them from other places, including China, which lengthened delivery times — a material fact he concealed from the government.

### ACTS IN FURTHERANCE OF THE SCHEME

28. In furtherance of the scheme to defraud, JACKSON committed the following acts, among others, in connection with the following contracts, all dates below being on or about the date indicated:

<u>2017 Department of State Contract – No. SAQMMA17M1144</u>

29. In June 2017, AQM solicited bids from contractors to supply the United States Embassy in Baghdad, Iraq with hundreds of NIJ Level IIIA ballistic resistant body armor and with ballistic helmets in various sizes.

30. On June 13, 2017, via the online portal of FedBid, JACKSON caused TBA to submit the lowest bid at $184,523.10, representing that TBA could deliver the items within thirty days of contract award. JACKSON falsely represented that Bullet Proof Armor LLC manufactured the helmets and that TBA manufactured the hard plate inserts. JACKSON also represented that TBA manufactured the body armor, that the soft body armor inserts were "NIJ IIIA" and that hard plate inserts were capable of withstanding specific types of ammunition.

31. On June 20, 2017, Individual A.D., the Contracting Officer ("CO") for AQM in Arlington, Virginia, in the Eastern District of Virginia, emailed JACKSON to ask for additional

information regarding the products, specifically the helmets. In this email, Individual A.D. advised JACKSON that this was not yet an award and that she needed more information about his products. Later that night, JACKSON emailed Individual A.D. additional information on the "ballistic helmets" and assured her that his products met requirements.

32. On June 29, 2017, Individual A.D. emailed JACKSON, stating that the government had further questions concerning the manufacturing of the products. She requested "verification and location if these products (helmets and vests) have been tested **to meet the specifications**" (emphasis in original). She added: "If you are the sole manufacturer of these products, please verify. We will need proof that these items have been tested."

33. On June 29, 2017, JACKSON responded falsely to Individual A.D. via email that "[w]e have had all products tested and verified not only by us but by 2 independent NIJ approved ballistic Laboratories." JACKSON added: "I will get the testing results to you ASAP from our person in charge of operation." JACKSON's statements were false because he did not have the products on hand and would be ordering some of them from China, therefore he could not have tested them when he sent the email. Moreover, JACKSON himself was the person in charge of operations.

34. On June 30, 2017, JACKSON emailed Individual A.D., attaching a falsified ballistic test report.

35. In the body of the same email dated June 30, 2017, JACKSON made further material misrepresentations to Individual A.D., by, among other things, stating:

    a. that "[w]e have also been tested by the NTS laboratory and in house as well."

    b. that he was not subcontracting and that his company was the manufacturer of the steel plates and the helmets.

    c. that subcontracting would speed up his delivery time, but that he wanted to maintain "quality control" of the products by manufacturing in house.

    d. JACKSON provided Individual A.D. with "our projected production time" for the steel plates and helmets of 28-30 days, stating that "all the products will be produced concurrently" and he asked her to pass the information on to officials at the United States Embassy in Baghdad.

    e. JACKSON further falsely represented to Individual A.D. that any performance delays would be due to the fact that his company "will be processing over 10,000 lbs of raw steel within that time frame."

    f. JACKSON further wrote to Individual A.D. in the same email, "the helmets is [sic] our one, sole worry since it [sic] uses specialized moldings, which crack periodically and require 3 days down time if they crack."

    g. JACKSON attributed shipment delays to being in a rural part of Texas and lacking a loading dock, intentionally omitting the material fact that he was ordering many of the products from China.

36. In truth and in fact, JACKSON's statements described in paragraph 35, above, were false because, among other things, JACKSON was not processing raw steel or making helmet moldings, as he had no industrial plant. Instead, JACKSON concealed the material facts that he was purchasing the helmets, vests, and other materials from a company in China and elsewhere, then having them shipped from China and other locations to Texas. Once in Texas, JACKSON would cause the products to be reshipped to the State Department, which, in turn would ship them to Baghdad for the use of security forces at the United States Embassy.

37. On July 17, 2017, Individual A.D. awarded State Department Contract SAQMMA17M1144 to TBA.

38. On July 19, 2017, without lawful authority, JACKSON used the identity of a real person, identified here as Individual H.A., and forged her signature on a contract with the Chinese company as the buyer of 500 ballistic helmets. JACKSON also forged her signature on a "Middlemen [sic] Certificate" with the Chinese company. On the "Middlemen [sic] Certificate" JACKSON, impersonating Individual H.A., further concealed that the State Department was the end-user by falsely stating that the helmets were intended for the United States Army.

39. Between July 20, 2017 and August 24, 2017, JACKSON caused three bank wire transfers to be made from TBA's JP Morgan Chase bank account to the Chinese company for the purchase of the helmets.

40. In an effort to explain shipping delays and to conceal the truth about shipping the helmets from China, between August 18, 2017 and August 24, 2017, JACKSON created false email exchanges between himself and a supposed employee of Company A, a real shipping company. The supposed employee was a real person identified here as Individual G.P. JACKSON did so without lawful authority or the consent of Individual G.P.

41. On September 10, 2017, an approximately 1,500-pound shipment of helmets arrived in Texas from China via air shipment.

42. On September 15, 2017, JACKSON caused Company A to ship the helmets to a State Department facility in New York, for further shipment onward to Baghdad, Iraq.

43. On October 11, 2017, the State Department wired over $184,000 to TBA's bank account for the purchase of the helmets and body armor.

44. Personnel at the United States Embassy in Baghdad used the body armor and helmets JACKSON provided in the line of duty. After concerns arose about the quality of the helmets and body armor, they were removed from service.

## EXECUTION OF THE WIRE FRAUD SCHEME

45. On or about June 30, 2017, in the Eastern District of Virginia and elsewhere, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, the defendant,

TANNER JACKSON,

did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit: Electronic communication between a computer located outside of Virginia to a computer located in the Eastern District of Virginia, to wit: an email from JACKSON to Individual A.D. with subject line "Testing, Delivery Time Frame."

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## Forfeiture Notice

## THE UNITED STATES ATTORNEY FURTHER ALLEGES FORFEITURE OF PROPERTY AS DESCRIBED HEREIN

Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the defendant, TANNER JACKSON, is hereby notified that if convicted of the offense listed in Count 1 of the Information, the defendant, TANNER JACKSON, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting or derived from proceeds obtained directly or indirectly, as the result of such violation.

The assets subject to forfeiture include, but are not limited to, the following: a monetary judgment in the amount of not less than $184,512, representing the proceeds the defendant obtained from the wire fraud scheme.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit to the United States any other property, real or personal, up to the value of the property described above, if by any act or omission of the defendant(s), the property subject to forfeiture:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred, sold to, or deposited with a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28 United States Code, Section 2461(c); Title 21, United States Code, Section 853(p); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

Respectfully submitted,

Raj Parekh
Acting United States Attorney

Date: October 20, 2021     By: _____
Russell L. Carlberg
Assistant United States Attorney