

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TANNER JACKSON,<br><br>Defendant. | Case No. 1:21-cr-238 |

## STATEMENT OF FACTS

The United States and the defendant, TANNER JACKSON, agree that had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

### I.  Factual Background

1. Defendant TANNER JACKSON is an individual who resides on a property in a rural area of Celeste, Texas.

2. Top Body Armor, LLC USA ("TBA"), based in Celeste, Texas, is a small reseller and manufacturer of various products—including body armor and helmets—to military and law enforcement clients. Defendant TANNER JACKSON variously represented himself as a "Project Manager" or "Sales Manager" of TBA. TBA was owned by JACKSON's wife but operated by JACKSON out of the couple's homes, first from a single-family dwelling in Greenville, Texas, then from their home and garage on a parcel of land in a rural part of Celeste, Texas. Other than JACKSON and his wife, TBA had no other regular employees.

3. TBA was registered in the General Services Administration's System for Award Management, whose computer servers are located in Sterling, Virginia, in the Eastern District of Virginia.

4. JACKSON submitted bids to the government on behalf of TBA through FedBid, Inc., whose computer servers were located in the Eastern District of Virginia.

5. Bullet Proof Armor LLC was another small entity that JACKSON and his wife ran from their home and purported to manufacture certain items, such as police and military grade helmets.

6. Company A was a real freight and shipping company located in Texas. TBA used Company A to receive and ship products it sold to the government.

7. The National Institute of Justice ("NIJ")—the research, developmental and evaluation agency of the U.S. Department of Justice—promulgates certain minimum performance standards for various levels of protection provided by body armor. NIJ's police body armor performance standard for ballistic resistance is the only national standard for police body armor. Personal body armor covered by this NIJ standard is classified into five types as follows, in order of ballistic protection level: IIA, II, IIIA, III, IV. Type IIIA body armor is designed to withstand .357 and .44 magnum handgun bullets, but not rifle fire.

8. The NIJ promulgates detailed and specific laboratory testing requirements for all levels of body armor, including Type IIIA. For an armor model to comply with the applicable standard, including Type IIIA, the NIJ specifies that all sample requirements and laboratory configurations must be met. The NIJ requires that an appropriate number of samples shall be subjected to the tests under its defined laboratory and testing standards.

9. Producing a valid ballistics test report under NIJ standards requires a laboratory setting with specialized instruments and other equipment.

10. Departments and agencies of the United States Government typically specify which type or level of body armor protection they require, and demand testing in compliance with NIJ laboratory and testing standards.

11. The consequence of a failure of body armor is death or serious bodily injury.

12. Although NIJ's protection levels are specific to body armor, a third party purchaser or seller may specify the same protection levels for items such as police and military helmets. Thus, a helmet labeled as Type IIIA must be capable of withstanding specified handgun rounds without failure, that is, without excessive deformation or bullet penetration, similar to Type IIIA body armor, under specified laboratory testing conditions.

13. The United States Department of State ("State Department") is a department or agency of the United States. The State Department's Office of Acquisition Management ("AQM") is located in Arlington, Virginia, in the Eastern District of Virginia. All United States Embassies are part of the State Department.

**II.    Criminal Conduct.**

14. From approximately June 2017 through approximately December 2020, in the Eastern District of Virginia and elsewhere, the defendant, TANNER JACKSON, devised, intended to devise, and executed and attempted to execute, a scheme and artifice to defraud a department or agency of the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by seeking and obtaining payment for body armor and helmets that were supplied to government clients based on material misrepresentations concerning the manufacturer, origin, supply chain, quality, testing, and delivery of products supplied by TBA. In executing the scheme to defraud, JACKSON would send emails containing materially false statements, representations, and promises from his computer in Texas to a

3

and shipping company, Company A, when those individuals never worked for such companies and did not consent to JACKSON using their personal identifying information.

20. JACKSON would create associated email accounts in the names of these persons—accounts which he actually controlled—and use them to communicate with himself and then to forward such communications to government officials in order to falsely reassure and lull government officials concerning the manufacturer, origin, quality, testing, and delivery status of body armor, helmets and other products supplied by TBA.

21. For instance, JACKSON would fabricate email exchanges about fictitious truck accidents or COVID outbreaks at Company A, then forward the exchanges to government officials, in order to explain his delays in performing on contracts and to conceal the true cause of the delays, which was that he was actually purchasing items from China and waiting for their shipment to the United States, and clearance through United States Customs, before he could re-package and then ship them to the government as though they had originated from TBA.

22. After winning bids to supply helmets, body armor and other products to government clients, JACKSON would exchange emails with salespeople at a Chinese company to purchase some of the items, and JACKSON would purchase those items, such as helmets, and have them shipped from China, then have Company A forward the products to government clients.

23. JACKSON would deliver some products late because TBA was not actually manufacturing those products nor had them on hand at the time JACKSON submitted TBA's bids to the government. Instead, JACKSON was sourcing them from other places, sincluding China under TBA's brand name, which lengthened delivery times — a material fact he concealed from the government.

computer in Arlington, Virginia, in the Eastern District of Virginia, as discussed further below, all in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

*Manner and Means of the Scheme to Defraud*

15. JACKSON would falsely represent on bids and in other communications with government contracting officers that TBA and Bullet Proof Armor were the manufacturers of body armor and helmets. In reality, JACKSON and TBA purchased those and other products from third parties, including a Chinese company, and were typically resellers of other companies' products.

16. In bidding on contracts, and during the performance of the contracts, JACKSON would falsely claim that TBA's body armor and helmets to be supplied under the contracts were already tested NIJ Type IIIA. In truth and in fact, at the time of bidding, TBA had not tested the body armor and helmets, and the helmets had not yet been purchased from the Chinese company.

17. JACKSON would falsify or alter laboratory ballistics test results and forward the falsified or altered test results to government clients.

18. In one instance, in connection with an Air Force contract, after his body armor failed testing, JACKSON created his own ballistics laboratory on paper, Texas Ballistics Laboratory LLC, to fabricate bogus ballistics test results to present to a government client in connection with the sale of body armor. The street address JACKSON provided on Texas Ballistics Laboratory's test results did not exist. JACKSON also created a website for Texas Ballistics Laboratory, LLC, to make it appear legitimate.

19. JACKSON would use, without lawful authority or consent, the personal identifying information of real individuals, including those of his own mother and personal friends, to pose, variously, as employees of one of his entities, as ballistics experts, or as employees of a real freight

*Acts in Furtherance of the Scheme*

<u>2017 Department of State Contract – No. SAQMMA17M1144</u>

24. In June 2017, AQM solicited bids from contractors to supply the United States Embassy in Baghdad, Iraq with hundreds of NIJ Level IIIA ballistic resistant body armor and with ballistic helmets in various sizes.

25. On June 13, 2017, via the online portal of FedBid, JACKSON caused TBA to submit the lowest bid at $184,523.10, representing that TBA could deliver the items within thirty days of contract award. JACKSON falsely represented that Bullet Proof Armor LLC manufactured the helmets and that TBA manufactured the hard plate inserts, when they were manufactured by third parties for TBA..

26. On June 20, 2017, Individual A.D., the Contracting Officer ("CO") for AQM in Arlington, Virginia, in the Eastern District of Virginia, emailed JACKSON to ask for additional information regarding the products, specifically the helmets. In this email, Individual A.D. advised JACKSON that this was not yet an award and that she needed more information about his products. Later that night, JACKSON emailed Individual A.D. additional information on the "ballistic helmets" and assured her that his products met requirements.

27. On June 29, 2017, Individual A.D. emailed JACKSON, stating that the government had further questions concerning the manufacturing of the products. She requested "verification and location if these products (helmets and vests) have been tested <u>**to meet the specifications**</u>" (emphasis in original). She added: "If you are the sole manufacturer of these products, please verify. We will need proof that these items have been tested."

28. On June 29, 2017, JACKSON responded falsely to Individual A.D. via email that "[w]e have had all products tested and verified not only by us but by 2 independent NIJ approved

6

ballistic Laboratories." JACKSON added: "I will get the testing results to you ASAP from our person in charge of operation." JACKSON's statements were false because he did not have the products on hand and would be ordering some of them from China, therefore he could not have tested them when he sent the email. Moreover, JACKSON himself was the person in charge of operations.

29. On June 30, 2017, JACKSON emailed Individual A.D., attaching an altered ballistic test report.

30. In the body of the same email dated June 30, 2017, JACKSON made further material misrepresentations to Individual A.D., by, among other things, stating:

  a. that "[w]e have also been tested by the NTS laboratory and in house as well."

  b. that he was not subcontracting and that his company was the manufacturer of the steel plates and the helmets.

  c. that subcontracting would speed up his delivery time, but that he wanted to maintain "quality control" of the products by manufacturing in house.

  d. JACKSON provided Individual A.D. with "our projected production time" for the steel plates and helmets of 28-30 days, stating that "all the products will be produced concurrently" and he asked her to pass the information on to officials at the United States Embassy in Baghdad.

  e. JACKSON further falsely represented to Individual A.D. that any performance delays would be due to the fact that his company "will be processing over 10,000 lbs of raw steel within that time frame."

    f. JACKSON further wrote to Individual A.D. in the same email, "the helmets is [sic] our one, sole worry since it [sic] uses specialized moldings, which crack periodically and require 3 days down time if they crack."

    g. JACKSON attributed shipment delays to being in a rural part of Texas and lacking a loading dock, intentionally omitting the material fact that he was ordering many of the products from China.

    31. In truth and in fact, JACKSON's statements described in paragraph 30, above, were false because, among other things, JACKSON was not processing raw steel or making helmet moldings, as he had no industrial plant. Instead, JACKSON concealed the material facts that he was purchasing the helmets, vests, and other materials from a company in China and elsewhere, then having them shipped from China and other locations to Texas. Once in Texas, JACKSON would cause the products to be reshipped to the State Department, which, in turn would ship them to Baghdad for the use of security forces at the United States Embassy.

    32. On June 30, 2017, JACKSON caused Individual A.D. to forward his falsified ballistics test reports and the associated false statements detailed in paragraph 30, above, to officials at the United States Embassy in Baghdad, who would be the end-users of the products.

    33. On July 17, 2017, Individual A.D. awarded State Department Contract SAQMMA17M1144 to TBA.

    34. On July 19, 2017, without lawful authority, JACKSON used the identity of a real person, identified here as Individual H.A., and forged her signature on a contract with the Chinese company as the buyer of 500 ballistic helmets. JACKSON also forged Individual H.A.'s signature on a "Middlemen [sic] Certificate" with the Chinese company. On the "Middlemen [sic] Certificate" JACKSON, impersonating Individual H.A., further concealed that the State

8

Department was the end-user by falsely stating that the helmets were intended for the United States Army.

35. Between July 20, 2017 and August 24, 2017, JACKSON caused three bank wire transfers to be made from TBA's JP Morgan Chase bank account to the Chinese company for the purchase of the helmets.

36. In an effort to explain shipping delays and to conceal the truth about shipping the items from China, between August 18, 2017 and August 24, 2017, JACKSON created false email exchanges between himself and a supposed employee of Company A, a real shipping company. The supposed employee was a real person identified here as Individual G.P. JACKSON did so without lawful authority or the consent of Individual G.P. Having created the email domain and account for Individual G.P., JACKSON then posed as Individual G.P., who JACKSON falsely represented as a "manager" of Company A. JACKSON forwarded the fictious email exchanges between himself and Individual G.P. to Individual A.D. on August 24, 2017, copying the email account of Individual G.P., which JACKSON really controlled. In these fabricated email exchanges, JACKSON falsely and materially represented as follows:

   a. That on August 21, 2017, Individual G.P. of Company A wrote to JACKSON that "the semi truck carrying your shipment and other shipments was involved in an accident. I will advise you as soon as possible on any updates"

   b. That on August 21, 2017, Individual G.P. of Company A wrote to JACKSON that "[p]art of the shipment was undamaged and was delivered on the 18th. 4 other pallets had slight cosmetic damage to the boxes. The insurance is taking photos. Everything will be repackaged and estimated re-delivery is the 25th."

  c. That on August 23, 2017, Individual G.P of Company A wrote to JACKSON that he had "[r]eceived conformation that the re-delivery is for the 25th. I'm sorry but the pallets have been re-packaged. No way we can check the PLs. All cartons were accounted for."

  d. That on August 24, 2017, JACKSON wrote to himself posing as Individual G.P, copying Individual A.D. as well as JACKSON's wife, the nominal owner of TBA, summarizing supposed information from Company A, that, among other things, "[o]riginal delivery was delayed because of an accident." Feigning indignation, JACKSON further wrote to himself, posing as Individual G.P: "Please let me know [Individual G.P] if ANYTHING changes on this shipment. This has been a bad experience to say the least."

  37. On September 4, 2017, JACKSON emailed Individual A.D. additional material misrepresentations, including that:

  a. "It's 9pm CST and we just finished re-packing the replacements for the damages cargo that got rejected/ returned to us from the warehouse in NJ."

  b. JACKSON further wrote that "as you saw in the email thread before, the semi with our cargo was involved in a serious accident."

  38. On September 10, 2017, an approximately 1,500-pound shipment of helmets arrived in Texas from China via air shipment.

  39. On September 15, 2017, JACKSON caused Company A to ship the helmets to a State Department facility in New York, for further shipment onward to Baghdad, Iraq.

  40. On October 11, 2017, the State Department wired over $184,000 to TBA's bank account for the purchase of the helmets and body armor.

41. Personnel at the United States Embassy in Baghdad used the body armor and helmets JACKSON provided in the line of duty. After concerns arose about the quality of the helmets and body armor, they were removed from service.

Other Contracts

42. JACKSON employed some of the same manner and means of the scheme discussed above in connection with other TBA bids and in other contracts between TBA and government clients, including with the Department of State and the Air Force.

43. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

44. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

~~Raj Parekh~~ Jessica D. Aber
~~Acting~~ United States Attorney

Date: ~~Click to enter a date.~~ Nov. 15, 2021

By: _____
Russell L. Carlberg
Assistant United States Attorney

11

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, TANNER JACKSON, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____  10-01-2021
TANNER JACKSON

I am John Teakell, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
John Teakell, Esq. (*pro hac vice* forthcoming)
Attorney for Tanner Jackson

12