IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TANNER JACKSON,<br><br>Defendant. | Case No. 1:21-cr-238<br><br>The Honorable Leonie M. Brinkema<br><br>Hearing: March 22, 2022 |

## UNITED STATES' SENTENCING POSITION

The United States of America, through undersigned counsel, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position on the sentencing of Tanner Jackson ("the defendant" or "Jackson"). The defendant comes before the Court for sentencing after pleading guilty to one count of wire fraud, in violation of Title 18, United States Code, Section 1343. The United States has no objection to the Probation Officer's calculations of the defendant's Sentencing Guidelines range as set forth in the Presentence Investigation Report ("PSR"), believing they are correctly calculated. *See* PSR ¶¶ 86-98, 142-143. For the reasons below, the United States submits that a term of imprisonment at the low end of the guidelines range would be reasonable and appropriate in consideration of all of the factors set forth in 18 U.S.C. § 3553(a).

### I. BACKGROUND

The defendant operated a scheme to defraud the State Department and the Department of Defense by falsely posing as a manufacturer of American-made ballistic-resistant steel helmets, body armor, and other police products. In reality, Jackson and his small company, Top Body Armor USA LLC, were resellers of other companies' goods, much of which Jackson purchased

1

from China and misrepresented as made in Texas. From 2017 through the execution of the search warrant in this case, in December 2020, the defendant lied to contracting officers who were trying to do their jobs to ensure that the products they procured for law enforcement and military personnel standing in harm's way were actually safe and properly tested according to National Institute of Justice ("NIJ") laboratory standards. Jackson's dangerous Chinese helmets were actually deployed to personnel serving at the United States Embassy in Baghdad, Iraq, one of the State Department's riskiest posts. They were also provided to Mexican law enforcement partners through a State Department foreign assistance program.

The defendant did not just lie by omission or limit himself to exploiting weaknesses in the contracting system—he affirmatively, and elaborately, deceived. The defendant falsified ballistics test reports after his own products had failed laboratory testing. He provided them to government contracting officers who were trying to protect those who would wear his helmets and vests in the course of protecting our embassies and military bases. The defendant created email domains to pose as a number of real people, including a friend from high school and his own mother, to whom he assigned roles in his scheme: ballistics laboratory employees, shipping company employees, and others, to create cover stories to explain away his delays in contract performance, or to backstop his falsified ballistics reports.

For instance, rather than telling the truth—that the helmets were delayed coming from China—the defendant created elaborate email exchanges between himself and the individuals whose identities he had stolen. He forwarded those exchanges to contracting officers or copied them at various points during the fake exchanges. The stories included fictitious trucking accidents; a false COVID "super-spreader" event at a shipping company's warehouse, complete with fatalities; faked dealings with an insurance company, and so forth. To explain his delays in

providing the helmets, he spun tales about the care he personally took in processing raw steel into helmet molds. *See* **Exhibit 1** (representative bogus emails). In fact, the closest the defendant got to making steel helmets was clicking "buy" on a Chinese website, wiring money overseas to a woman who went by the name of "Leticia," and authoring bogus email exchanges. He also used his mother's name (without permission) and forged her signature to export documents from China to obtain the helmets. *See* **Exhibit 2**.

What economic value the defendant added to the government and law enforcement personnel in this whole sequence is hard to discern. Any contracting officer could have done the same thing Jackson did, and without the middleman markup, if buying cheap helmets from China over the internet were somehow acceptable. Of course, it was not. Contracting officers, sadly, thought they were dealing with a quality American manufacturer when they contracted with Jackson.

The defendant successfully and rapidly built a lucrative enterprise based at least in part on defrauding the government. As detailed in the PSR and the Statement of Facts, the defendant lied repeatedly over email and telephone to a State Department contracting officer, Individual A.D., to make sure he got that $184,512 contract to supply the U.S. Embassy in Baghdad. This was his first successful large contract. From there, the defendant lied on additional contracts, including two contracts with the Air Force, and additional State Department contracts. He also engaged in uncharged fraud by falsely claiming that Top Body Armor was located in a certified HubZone, when it was, in fact, located on his remote property in a rural part of Texas. This deceit enabled the defendant to obtain millions of dollars in set-aside contracts that he should not have been awarded. In a sort of coda to his career with Top Body Armor, the defendant also submitted fraudulent materials to a lender to obtain a Paycheck Protection Program loan, falsifying an IRS

Form W-2 (and fabricating a employee pay statement) in the name of his father, who was never an employee of Top Body Armor. *See* **Exhibit 3**. At age 33, the defendant, through this series of events, has made himself into a millionaire, as the PSR recounts. The defendant is, thus, financially capable of paying full restitution and a criminal fine, in addition to serving an appropriate custodial sentence.

## II. GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685.

### A.   The Base Offense Level and Loss Amount

The base offense level of 7 is not in contention. The total intended loss amount is between $250,000 and $550,000, so that a 12-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(G). The parties stipulated in the plea agreement that the loss was at least **$184,512**, which is the value of the 2017 State Department contract to supply the U.S Embassy in Baghdad with ballistic-resistant helmets and vests. This was the floor, so to speak, as the plea agreement allowed the government to argue for a higher loss amount. *See* Dkt. No. 11 at 3; PSR ¶ 4. The government makes that argument here, agreeing with the Probation Officer that additional intended losses include the following:

- **2017 United States Air Force Contract FA485517P0054**. The defendant used the identity of a real person, Individual M.L., at NTS Wichita, an NIJ-certified ballistics laboratory, to create a false cover letter and fake lab report, addressed to another real person (whose identity had also been stolen), Individual G.P, purporting to show that Top Body Armor's product had passed ballistics testing. *See* **Exhibit 4** (note forged M.L. signature and use of name of another high school friend, Individual C.C. as a "gunner"); PSR ¶ 63.  When the forgery was discovered, the Air Force cancelled this contract, paying Jackson a $10,000 nuisance fee to terminate for convenience. **Intended Loss: $21,120**

- **2017 State Department Contract SMX90017M0225**. Here, the defendant contracted to supply the United States Embassy in Mexico City with 20 ballistic helmets, body armor, and other tactical gear. Again, Jackson purchased the helmets and other gear from China, despite falsely claiming he manufactured the items in Texas. *See* PSR ¶¶ 66-68. **Intended Loss: $30,970.55**

- **2019 U.S. Air Force Contract FA524019Q0031**. The defendant's body armor failed testing with Oregon Ballistic Labs, a legitimate NIJ-certified ballistics testing laboratory. *See* **Exhibit 5**.  The very same day he received the failed test report, the defendant turned around and created a bogus test report in the name of "Texas Ballistic Laboratory, LLC," a fictious entity of his own devising. *See* **Exhibit 6**. Because he had no laboratory with equipment capable of measuring the tests he reported, it is clear that the defendant simply copied portions of the failed Oregon report, changed the score, and gave himself passing marks in his fake report. He then sent it to the Air Force in an attempt to obtain the contract. The defendant's

deception weas detected. After the search warrant was executed, the defendant began a campaign with the Air force to supply American-made goods and to fix. None of that erases the intent at the time he attempted the scheme. *See* PSR ¶¶ 69-75. **Intended Loss: $124,793.99**.

- **2020 State Department Contract 19AQMM20P1402**. This contract was to supply the Honduran National Police, through a State Department foreign assistance program, with 2,500 sets of handcuffs, flashlights, tactical backpacks, and other items. As part of this scheme, the defendant again stole personal identities and engaged in forgery. To obtain permission from Chinese authorities to export the products, he was required to submit "End User Certificates" to Leticia. He provided two. One was a forgery by a fictitious person, "Nelson Lagos Flores," the supposed "Inspector General of the Honduran National Police," on Honduran police official letterhead. *See* **Exhibit 7**. The defendant appears to have used the Lagos Flores family names of a real Honduran Police General but changed the General's first name to Nelson. He also stole the identity of an Embassy employee, Individual G.S., and forged her signature, on an "End User Certificate," complete with falsified State Department letterhead and seals *See* **Exhibit 8**. He provided both of those forged documents to the Chinese to enable the exportation of the police-military items. His also falsely indicated to the U.S. Embassy in Honduras that Top Body Armor USA LLC was the manufacturer of the items that he was buying from China. In truth and in fact, it was all purchased from China and its export was accomplished by identity theft and forgery. *See* PSR ¶¶ 77-79. **Intended Loss: $64,900**.

Thus, the total intended loss is, thus, **$426,278.54**. PSR ¶ 88. The total actual loss for purposes of restitution remains **$184,512.** None of this, of course, includes the HubZone set-aside fraud that amounted to over $550,000 in itself. The Probation Officer, therefore, has correctly applied a twelve-level offense increase for loss under § 2B1.1(b)(1)(G).

B.      **Sophisticated Means**

The Probation Officer has concluded, correctly, that there is a two-level enhancement for sophisticated means. PSR ¶ 89. This scheme operated with the type of multilayered sophistication that the Fourth Circuit has found to satisfy the sophistication enhancement. *See United States v. Davis*, No. 18-4080, 2018 WL 5096070, at *1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means enhancement where the defendant created a "multilayered scheme" and "used numerous means to conceal the fraud, including forgery, altering documentation, transferring money between accounts, and omitting property from certain accountings"). "The enhancement requires some means of execution that separates the offense from the ordinary or generic." *United States v. Jinwright*, 683 F.3d. 471, 486 (4th Cir. 2012). "On the other hand, a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *Id*. (internal citations omitted).

The defendant used without permission or lawful authority the identities of Individuals G.P, H.A., G.S., M.L. and others to execute critical aspects of the scheme to defraud. See **Exhibits 1-8**; PSR ¶¶ 50, 63, 75. He took the additional steps of setting up email accounts and even email domains he controlled in the names of Individuals G.P and H.A., as well as a true shipping company, and his fake testing company, Texas Ballistics Laboratory. *See Id*. He used these accounts to weave his stories about super-spreader events, fatalities, bogus truck accidents, and so forth, that he used to fool and lull contracting officers. The defendant engaged in export fraud with respect to China and used real individuals' identities to sign a contract with the Chinese

company, as well as various forging various export documents, such as the "End User Certificates." The creation of these forged documents must have taken time and care, as they appeared sophisticated enough to fool both United States and Chinese officials.

### D. Reckless Disregard of Death or Serious Bodily Injury

This enhancement should not be in dispute, given that the defendant's signed Statement of Facts clearly recites that the consequence of failure of body armor and helmets in death or serious bodily injury. *See* Dkt. No. 12 at ¶ 11; *see also* PSR ¶ 25. The fact that the defendant's helmets supplied to the State Department for use in Baghdad failed testing, with full bullet penetration of one helmet, and concomitant massive deformation, should be enough to end any debate about this enhancement. Any law enforcement or military personnel wearing such helmet would die, or certainly suffer a life-altering brain injury, at the very least *See* **Exhibit 9**. Moreover, the fact that the defendant so readily provided altered and entirely faked ballistics laboratory reports for his body armor is extremely troubling, showing, at the very least, a reckless disregard of the safety of the personnel who would be wearing his products in the line of fire.

Any notion that the defendant exercised reasonable care by supposedly firing a gun at body armor or helmets at a range or in his backyard should be rejected; it actually illustrates his disregard of industry standards for these life-safety products. According to experts at the NIJ, only a certified laboratory with appropriate scientific equipment is qualified to conduct accurate and reliable ballistics tests. Such equipment includes a special "receiver" (not the defendant's handgun or rifle) to fire a specially loaded round, which needs also scientific equipment to measure its trajectory and speed. Further, special clay moldings must be used to measure the deformation of the body armor when it is struck by the rounds fired. The Statement of Facts to his guilty plea recites as

8

much. Dkt. No. 12 at ¶¶ 7-10; PSR ¶¶ 21-24.  The defendant could not, and did not, have any of this specialized and expensive testing equipment. Nor was he an expert in testing or lab work.

By his own account, through his objections provided to the Probation Officer, the same day he received a failing report from Oregon Ballistics Lab, he administered his own self-test, then concocted the passing Texas Ballistics Laboratory LLC report and the forged cover letter. That he offered this in mitigation to the Probation Officer as evidence of his concern for others is troubling. If anything, it underscores his recklessness and his lack of honesty with contracting officers, who clearly would have wanted to know this information. The defendant cut corners and put others at risk, all so he could profit.

Defective testing of life-safety equipment like body armor and helmets poses an unacceptable risk of endangering law enforcement personnel. *See, e.g., Pinnacle Armor, Inc. v. United States*, No. CVF 07-1655 LJO DLB, 2008 WL 108969, at *6–7 (E.D. Cal. Jan. 7, 2008) ("[H]ere, plaintiff asks the Court to circumvent testing and safety standards embodied in the 2005 Interim Requirements and mandate that the Dragon Skin complies with NIJ standards. This the Court cannot do. The balance of possible financial harm to plaintiff, as compared to the possible endangerment of law enforcement officers, decidedly tips against granting the preliminary injunction."). It thereby follows that concealment of *failed* test reports, and substitution of faked and forged ballistics reports, are even worse. Surely, such conduct falls within the reckless disregard standard.  Moreover, the guideline only requires *reasonable foreseeability* of the risk, not even actual participation in creating the risk, nor actual harm. *See e.g. United States v. Kantete*, 610 F. App'x 173, 176 (3d Cir. 2015) (guideline applied to defendant who resold carjacked vehicles).  Here, the defendant himself executed the entire deceptive scheme and the faked testing. Thus, the enhancement certainly applies. *See also United States v. Henderson*, 893 F.3d 1338,

1351 (11th Cir. 2018) (in health care fraud case, government need not show actual patient harm, just awareness that conduct created increased risks for patients).

    F.    **Acceptance of Responsibility**

The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and, in accordance with the plea agreement, hereby moves for the additional one-point reduction under U.S.S.G. § 3E1.1(b).

### III.  IMPOSITION OF SENTENCE

Under 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

Likewise, "[t]he fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of

sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita,* 551 U.S. at 347-50. 28 U.S.C. §§ 991(b)(1)(A), 994(f). In general, then, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted). Based on all these factors, a sentence at the low end of the guidelines is appropriate in this case. If the Court is inclined to vary downward based on sealed filings of the defendant, the United States contends that any such variance ought to be quite modest, given the seriousness of this case.

### A. The Nature, Circumstances, and Seriousness of the Offense

According to the National Institute of Justice, body armor is of critical life-safety concern to law enforcement due to the destructive force of modern firearms:

> Firearms are one of the most dangerous threats faced by law enforcement officers in the United States. During the past three decades, ballistic-resistant soft body armor has saved the lives of more than 3,000 police officers. Body armor is critical safety equipment that law enforcement and corrections officers need for personal protection.

https://nij.ojp.gov/topics/articles/overview-body-armor (last visited March 8, 2022). The NIJ adds that "[a] study published in the Journal of Occupational and Environmental Hygiene found that officers who do not routinely wear body armor are 3.4 times more likely to suffer a fatal injury from a torso shot than officers who routinely wear body armor." *Id*. (*citing* LaTourrette, T., "The Life-Saving Effectiveness of Body Armor for Police Officers," Journal of Occupational and Environmental Hygiene 7(10), 2010). Even the defendant conceded in his Statement of Facts that the consequences of the failure of body armor or helmets is life or serious bodily injury. Dkt. No. 12 at ¶ 11; *see also* PSR ¶ 25.

It is further not in dispute that the defendant both altered and falsified ballistics laboratory

reports, evading the NIJ's very testing standards. He did so in order to sell life-saving equipment to officers serving in dangerous places, like Baghdad, Iraq. Moreover, he wove elaborate lies to fool the State Department's contracting officer, Individual A.D., into believing that his helmets were made of raw steel and carefully constructed by his company in the United States. In reality, the email traffic reveals that at the same time he was lying to Individual A.D., he was scrambling with Leticia at the Chinese company to fill the helmet order with untested, cheap Chinese helmets from whatever sources Leticia, in turn, could procure them. In this series of events, the defendant evinced scant regard for the quality of the products or the safety of the men and women who would wear them in Baghdad.

There is a good reason why the Sentencing Guidelines provide for a two-level enhancement for conduct that puts others' lives and health at serious risk. For the same reasons, the Court should consider this offense conduct as particularly troubling under Section 3553(a)(2)(A), for the potential harm posed to many secondary victims of the scheme: U.S. and foreign law enforcement officers who unwittingly donned products Jackson supplied. *See also Jinwright*, 683 F.3d at 488 (in case where the government is pecuniary victim, "[w]e have recognized, however, that the offense of conviction may harm secondary victims as well") (citing *United States v. Akinkoye*, 185 F.3d 192, 204 (4th Cir.1999); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir.1996); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir.1997)). This is not furniture or office supplies; these were contracts for protective gear that could determine whether somebody's son, daughter, father, or mother ever came back from Iraq, or a day's work in the Yucatan.

The State Department was so concerned about Jackson's body armor and helmets that all were pulled from service after the fraud was detected. Jackson's helmets failed testing and showed massive deformation from bullet penetration. *See* **Ex. 9**. Had a Diplomatic Security special agent,

or locally employed guards, in Baghdad been wearing Jackson's helmets and been struck by a round in a firefight—not a remote possibility there—they would not likely have survived. The defendant should be held fully accountable for the grave risk to the lives of law enforcement that he was all too happy to run when sitting in safety of his home.

Further, Jackson's scheme stole the identities of real people. He used their names and forged their signatures in myriad ways. Such victims included his mother, his father, two friends from high school, an employee of a ballistics laboratory, and a U.S. Embassy employee. He even provided his mother's full name and social security number to the Chinese as the purchaser of the helmets and forged her name as the buyer of record. *See* **Exhibit 2**. These people had to speak to law enforcement, sometimes on multiple occasions. Jackson, not the investigators, put them through that.

### B. The Defendant's History and Characteristics and the Need for Specific Deterrence

The history and characteristics of this defendant support a meaningful carceral sentence, yet one that also accounts for the defendant's attempt to pay restitution early and the attempts he has made to assist law enforcement.[1] Although he comes before the Court with no scored criminal history, it is quite clear that the defendant has engaged in multiple criminal schemes, many centering around forgery and identity theft. The relevant conduct at issue is substantial enough, but the defendant's conduct includes other uncharged crimes —such as the HubZone fraud and the PPP loan fraud—that the Court may properly consider under this sentencing factor and under 18 U.S.C. § 3661.

---

[1] The government is not making any motion for substantial assistance. The government will be prepared to address at the sentencing hearing anything that the defense files under seal or questions from the Court.

The defendant has proven himself quite adept at forgery and was only stopped because he was detected and prosecuted. At a relatively young age, the defendant has demonstrated aptitude and dedication to cheating others through various means. That Jackson did so with respect to life-safety equipment is especially concerning. It makes this case stand out from the typical procurement fraud case.

The level of the intentional deception —the falsified and forged documents, the elaborate stories told through multiple stolen identities over email— speaks to the conscious (indeed, willful) disregard for the safety of others. These layers of complexity made the crime more difficult to unravel, and thereby deserving of greater punishment than an ordinary fraud. *See, e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

The defendant also, since pleading guilty, has made attempts to make amends. His payment of full restitution and his attempts to assist law enforcement are facts that deserve consideration in fashioning the ultimate sentence. For all of these reasons, a sentence within the applicable guidelines range, or one not too far below the low end, is necessary to deter this defendant. Were the defendant to receive an extremely light sentence, the risk is that he could later view the price as acceptable when he contemplates the ongoing temptations to cheat, whether that is in business, on his taxes, or in his dealings with the government. After all, ample opportunities for forgery, identity theft, and other types of false pretense fraud will continually present themselves in the future, given the way modern life works, combined with the age of this defendant. A custodial

sentence at the low end of the applicable guidelines range, is sufficient, but not greater than necessary, to achieve the goals of federal sentencing.

C. **Need to Deter Future Criminal Conduct and Promote Respect for the Law**

A significant but not excessive sentence is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). A significant custodial sentence is necessary to send the appropriate message to this defendant, and importantly, to others who are closely watching, that those who engage in this conduct will be caught and punished significantly.

D. **Avoid Unwarranted Sentencing Disparities**

Jackson is the only defendant in this case, so there are no other sentences in this matter. Moreover, a sentence pegged to the guidelines is less likely to create future sentencing disparities in serious cases such as this. The Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610

(6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")." Accordingly, for this reason, to, a sentence at, or not too far below, the low end of the guidelines range, is appropriate for this defendant, all things considered.

## IV.  CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a custodial sentence at the low end of the applicable guideline range, a final order of restitution, a three-year term of supervised release, and a criminal fine, are appropriate in this case. Should the Court be inclined to vary downward based on sealed filings by the defendant and his early payment of restitution, the United States submits that any such variance ought to be modest, given the seriousness of this offense.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2022, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Kelly M. Smihal
Senior United States Probation Officer
Kelly_Smihal@vaep.uscourts.gov

                                                            /s/
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov